Filed 10/22/21  P. v. Gonzalez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B304723 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA471725) |
| v. | |
| JESUS ESGARDO GONZALEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig E. Veals, Judge.  Affirmed.

Tracy L. Emblem and Susan Wolk, under appointments by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Appellant Jesus Esgardo Gonzalez was one of two men jointly charged with severely injuring David Acosta during a group assault at a large evening gathering. Gonzalez's defense was that Acosta attacked him. Neither Gonzalez nor codefendant Martin Lararosas testified. The jury convicted Gonzalez of assault and found true a special circumstance finding that he personally inflicted great bodily injury. The jury hung on all counts as to Lararosas.

On appeal, Gonzalez claims prosecutorial misconduct. Primarily he argues that the prosecutor committed reversible error by accusing defense counsel of "coaching" Jose V., an 11-year-old witness and defendant's nephew, who in about 90 minutes of direct examination failed to identify the victim Acosta as an attacker of Gonzalez, but immediately reversed his testimony after a lunch recess when he identified Acosta as having attacked Gonzalez.

A prosecutor may permissibly and vigorously comment on the credibility of witnesses and try to persuade the jury that a witness is unworthy of belief. Here, the prosecutor was entitled to point out the sudden, unexplained change of testimony by Jose with respect to his identification of Acosta. However, he did not accuse the defense attorney or anyone else of "coaching." His comments were based on the evidence, and do not represent reprehensible or deceptive conduct. Gonzalez's cases are inapposite because they address situations involving specific and egregious allegations of defense counsel "coaching."

The prosecutor's argument about the significance of injuries sustained by Gonzalez (and another assault participant) during the attack was also based on a reasonable inference to be drawn from witness testimony and did not constitute misconduct.

2

So, too, was the prosecutor's questioning of Gonzalez's wife over her knowledge of Acosta's injuries in order to test her credibility. He did not overstep his bounds when using video clips taken by police.

Accordingly, we affirm.

## FACTUAL AND PROCEDURAL SUMMARY

### A.    The Assault

The brawl took place at a quinceañera on the evening of September 15, 2018.  Acosta, the victim of the attack, arrived at the party around 8:00 p.m., accompanied by his wife, Maria Solorzano, and their 11-year-old son, Antonio.  Approximately 150 to 200 people were in attendance.

Around midnight, Acosta and Solorzano heard an argument, and soon saw about 20 people fighting near the entrance.  Because Antonio was playing outside, Solorzano told Acosta to find him so they could leave.

Shortly after Acosta located his son outside, Lararosas, who was involved in the fight, stopped and confronted Acosta, who replied he was looking for his son.  At that moment another man, Lararosas's cousin, pushed Acosta to the ground and the assault commenced.

While on the ground being kicked—Acosta estimates over 50 times by four individuals—he heard his son yell at his attackers to stop.  Acosta also heard someone yell, "Die bitch," "Hit the faggot more.  This motherfucker needs to die," and "That faggot.  Don't let him get up."  After Solorzano attempted to intervene, Acosta saw the faces of two people, Gonzalez and Lararosas; he also saw Lararosas hit Solorzano.

Solorzano testified that she saw Lararosas and Gonzalez repeatedly kick Acosta and then saw two or three other people

3

join in the assault. Solorzano later testified that all of the men were kicking Acosta "everywhere" and that she pushed the men aside to get to Acosta.

Acosta's son Antonio also observed the fight. From approximately five feet away, Antonio saw three people kick his father, including Gonzalez. He estimates Gonzalez kicked his father more than 10 times. Although Antonio screamed at Gonzalez and the other men to stop kicking his father, they continued the assault. After Solorzano intervened, Antonio again saw that Gonzalez was one of the attackers.[1]

Acosta was hospitalized for three days. Dr. Jim Seraj testified that Acosta suffered bruises, an eighth rib fracture, a possible ninth rib fracture, and a possible right apical pneumothorax (air outside the lung), which could have caused death from obstructed breathing. The beating also affected Acosta's vision, requiring him to begin wearing glasses.

After learning that Acosta had been injured and was headed to the hospital, Acosta's sister, Melissa, went to the hospital at approximately 1:00 a.m. Antonio told Melissa (who had not attended the quinceañera) that the Gonzalez brothers, meaning Gonzalez and Lararosas, had been involved in the brawl.

A few days later, Melissa showed Antonio a Facebook photograph depicting Gonzalez, Lararosas, and two other men. Antonio identified Gonzalez and another man, Gonzalez's brother Sebastian, as two of Acosta's assailants. Melissa wrote the

---

[1] Upon their arrival the police interviewed Antonio. One of their body cameras filmed the interview, which was later admitted as People's Exhibit 1 and played before the jury.

4

names "Martin," "Esgardo" (Gonzalez's middle name), and "Sebastian" on the back of the photograph, later showing it to Acosta himself, who identified Gonzalez as one of his assailants.

At trial, Acosta testified that he was "One hundred percent" certain he had been attacked by Gonzalez and Lararosas and positively identified Gonzalez as his assailant while on the stand. He also related his identification of his assailants at the hospital, telling Melissa that the ones who assaulted him were "Jesus's sons," meaning Gonzalez and Lararosas.[2]

Eleven-year-old Jose, Gonzalez's nephew, who also attended the quinceañera, was called as a witness by the defense and testified on his initial direct examination for approximately 90 minutes. Among other topics, Jose testified about what happened at the party, who was with him, what happened at the end, how the fight started, how many people were fighting, and where he was located during the fight.

While leaving the party with his mother, Jose observed several drunken men who were cursing and combative. While Gonzalez was holding his daughter, five men approached and began to attack Gonzalez. Jose did not see Gonzalez fight back.

Toward the very end of his direct examination, Jose was shown several photographs of Gonzalez's supposed assailants, but failed to identify Acosta as one of them. As this occurred immediately prior to a lunch break, defense counsel approached

---

[2] Acosta was impeached on his positive identification of Gonzalez. At Lararosas's preliminary hearing, Acosta testified that he did not know his assailants, did not see them, and only learned of their names at a later date. Acosta explained that he did not provide a description of his assailants when questioned on the night of the brawl because he was unable to breathe.

the bench and told the court she wanted to continue the examination after lunch and show Jose a screen shot from a video "and ask the witness if he recognizes an additional witness."

The court inquired who was that witness, and defense counsel replied he was "[t]he complaining witness," i.e., Acosta. The court observed that it "defies any sense of credulity" that defense counsel could have Jose on the stand for "90 minutes," "and something as important as that" never be raised. Nevertheless, the court allowed her to proceed with her additional examination.

After the lunch break, Jose changed his testimony, immediately identifying Acosta as one of the men involved in the attack on Gonzalez.

## B. Information and Conviction

On April 29, 2019, the People charged Gonzalez in a two-count information with assault with force likely to produce great bodily injury in violation of Penal Code section 245, subdivision (a)(4) (count 1),[3] and misdemeanor battery in violation of section 242 (count 2). As to count 1, the information further alleged that Gonzalez personally inflicted great bodily injury in violation of section 12022.7, subdivision (a).

Gonzalez pled not guilty and was tried by jury together with Lararosas. On September 10, 2019, the jury found Gonzalez guilty as charged on count 1; and the jury found the special allegation to be true. The jury hung on the misdemeanor battery offense (count 2).[4]

---

[3] All further statutory references are to the Penal Code, unless otherwise specified.

[4] The jury hung on both counts as to Lararosas.

The court sentenced Gonzalez to three years in state prison. The court imposed the middle term of three years on count 1, but struck the great bodily injury enhancement (§ 12022.7, subd. (a)) for sentencing purposes only.

Gonzalez timely appealed.

## DISCUSSION

Gonzalez asserts prosecutorial misconduct on various issues, primarily his closing argument directed toward the credibility of Jose (improperly implying "coaching" on the part of defense counsel and impugning her character), his distortion of Jose's testimony (wrongly implying that it corroborated the People's case), and his cross-examination of Gonzalez's wife, Larissa (alleging that it was only intended to inflame the jury).

### A. Standards of Review

A prosecutor's comments constitute "reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)

A trial court's refusal to give a limiting or curative instruction is similarly reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Cavitt* (2004) 33 Cal.4th 187, 209.)[5]

---

[5] Although Gonzalez identifies the federal standard for evaluating prejudice in his opening brief (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 75), the errors

## B.    The Prosecutor Did Not Commit Misconduct

Gonzalez called Jose, in an effort to demonstrate that it was *Acosta* who beat *him*.  Defense counsel examined Jose for approximately one-and-a-half hours and, toward the end, showed him several photographs while asking Jose whether he could identify the persons depicted in them as people who attacked Gonzalez.  Although Jose identified two of Acosta's friends, he failed to recognize Acosta.

"[Defense Counsel]:  One more person.  Just take a look at it and tell me if you – if you recognize that person from the night of the quinceañera or not.

"[Jose]:  No.

"[Defense Counsel]:  Okay.  All right.  Are you telling us the truth today?

"[Jose]:  Yes.

"[Defense Counsel]:  Okay.  Has anybody told you what you should say?

"[Jose]:  No."

Immediately following that testimony (at the lunch break), defense counsel asked the court outside the presence of the jury whether she could show Jose a screen shot from a video "and ask the witness if he recognizes an additional witness."

The court inquired who was that witness, and defense counsel replied he was "[t]he complaining witness," i.e., Acosta.  The court responded that it "defies any sense of credulity" that defense counsel could have Jose on the stand for "90 minutes," "and something as important as that" never be raised.

---

argued here involve state law only and Gonzalez does not argue otherwise in his reply brief.

Nevertheless, after colloquy, the court stated it would allow additional examination on the identification of alleged perpetrators after lunch.

Once court resumed, Jose promptly changed his testimony and readily identified Acosta as one of the supposed attackers of Gonzalez, his uncle:

"[Defense Counsel]: Okay. I just want to show you a couple more photos, three more photos. Can you take a look at them and see if you recognize this person or not? And then I might show you a video as well.

"[Jose]: Yes. I remember [Acosta]."

During his closing argument, the prosecutor minimized the credibility of Jose: "Then you heard from Jose yesterday. And I think you all saw what happened with him. You all saw what I saw, why he said what he said. All due respect, adorable little dude. But the words he's using are not his. What he's telling is not what he saw. It's just not."

In rebuttal argument, the prosecutor continued:

"And then the defense brought in Jose . . . . We're going through two weeks, not a single person, not one person here came and said that Mr. Acosta had done anything wrong that night. Not one witness, not a scintilla of evidence was introduced that Mr. Acosta was at fault. Then Jose took the stand. And then Jose was shown a lot of photographs, and he was asked a lot of questions. . . . He's brought to court, and he's asked about this photograph. He's asked who he recognizes. He said he recognized the person in the cowboy hat, then the photo was published on the Elmo. Then he was asked do you recognize him? Do you recognize him? Zooming all the way. He said no. I don't recognize him. It was defense [Exhibit] N. I even made a

record of it.  And then finally that photo was placed here and says do you recognize him?  Do you recognize him?  No.  I don't recognize him.  I don't recognize him.  And then there was lunch break.  Do I have to say more?  Voila.  I recognize him."

Immediately after the jury retired to begin deliberation, defense counsel asked the court to instruct the jury with the following written instruction:

"A prosecutor is held to the highest ethical standards to ensure the defendants receive a fundamentally fair trial.  This prosecutor violated his ethical standards and committed misconduct.

"The prosecutor committed misconduct when he argued that defense counsel have no defense, and . . . 'they are blowing smoke' . . . .  Publishing a slide with those words was also misconduct.  He further committed misconduct when he suggested counsel had done something over the lunch break to cause Jose . . . to identify the person shown to him in a new set of photographs.  When he implied that the defense put forth a sham defense, and that the defense counsel is dishonest, he violated his ethical obligation and committed misconduct.

"Further, he engaged in deceptive and misleading argument when he argued that Jose . . . testified that his uncle suffered from cracking feet after the quinceañera without explicitly mentioning that the witness testified that it was his uncle Sebastian, not the defendant . . . Gonzalez who had injuries to his feet.  Finally he committed misconduct by deliberately withholding his arguments about the defense witnesses until

10

after both defense counsel had finished their only opportunity to respond to his arguments."**6**

It is well established that a prosecutor is free to give an opinion on the state of the evidence and has "wide latitude" to comment on its quality and the credibility of witnesses, as long as it is a fair comment on the evidence and/or are reasonable inferences to be drawn therefrom. (*People v. Bonilla* (2007) 41 Cal.4th 313, 336-337; see also *People v. Martinez* (2010) 47 Cal.4th 911, 957 [prosecutors "are allowed 'a wide range of descriptive comment' and their ' " 'argument may be vigorous as long as it amounts to fair comment on the evidence' " ' "].) Moreover, "it is a truism that the prosecutor may try to persuade the jury, on the strength of the evidence, that a witness is unworthy of belief. Although such locutions as 'coached testimony' are to be avoided when there is no evidence of 'coaching' . . . ." (*People v. Thomas* (1992) 2 Cal.4th 489, 537.)

The sudden change in Jose's testimony over the lunch break gave the prosecutor ample ammunition with which to legitimately question Jose's credibility. However, in doing so he never mentioned the word "coaching" or personally accused the defense attorney of doing anything wrong. Telling the jury that

---

**6** Although the court rejected this instruction, it had previously admonished the jury during the prosecutor's closing argument, upon defense counsel's contemporaneous objections, as follows: "You must base your decision on the facts and the law. . . . If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." The court similarly admonished the jury two additional times to the same effect.

11

"the words he's using are not his" or "then there was lunch break. Do I have to say more?  Voila.  I recognize him," is a far cry from *Thomas*, wherein the California Supreme Court held that even a specific prosecutorial locution on a " 'coached' " witness "did not reach the level of prejudicial misconduct."**7**  (*People v. Thomas*, *supra*, 2 Cal.4th at p. 537.)

Gonzalez's cases are similarly distinguishable because they address situations involving far more specific and egregious "coaching" violations.  (See *People v. Bain* (1971) 5 Cal.3d 839, 845, 847 [prosecutor repeatedly accused defense counsel of lying in connection with presentation of evidence]; *People v. Woods* (2006) 146 Cal.App.4th 106, 116 [prosecutor argued that defense witnesses " 'were conjured up' " " 'over the weekend' " by defense

_____

**7** There is no record of what transpired during the lunch break, although we note multiple individuals other than Gonzalez's defense attorney could have come into contact with the 11-year-old witness.  During his direct and cross-examination, Jose admitted that he talked with Gonzalez and Lararosas "almost every day."  His mother, i.e., Gonzalez's sister, was the one bringing him to and from court every day, and mother and son sometimes talked about the brawl at the quinceañera.  He had previously spoken not only with Gonzalez's defense attorney but also, in a group, with her, Lararosas's defense attorney and a defense investigator.  Since the record does not show the jury was ever told about defense counsel's plan to speak with Jose and show him additional pictures, and since it is silent about anyone who might have come into contact with him during lunch, the record does not support Gonzalez's inference that defense counsel was at fault for "coaching" Jose's testimony.  (See *People v. Molina* (2000) 82 Cal.App.4th 1329, 1335-1336 [appellate courts will not infer prejudice from a silent record].)

attorney]; *People v. Herring* (1993) 20 Cal.App.4th 1066, 1073 [prosecutor implied defense counsel had suborned perjury by arguing, among other things, that defense counsel "has to tell [his witnesses] what to say [and] . . . does not want you [the jury] to hear the truth"].)[8]

The prosecutor was entitled to point out the sudden, unexplained change of testimony by Jose on the identification issue, and his comments to the jury do not evidence reprehensible or deceptive conduct. (*People v. Bonilla, supra*, 41 Cal.4th at pp. 336-337; *People v. Thomas, supra*, 2 Cal.4th at p. 537.)[9]

Gonzalez's remaining claims of additional prosecutorial misconduct also fail. There was no misconduct when the prosecutor argued that the injuries Jose observed on Gonzalez

---

[8] Following closing argument, defense counsel proposed a strongly-worded instruction condemning the prosecutor's misconduct. (At pp. 10-11, *ante*.) The trial court was in the best position to assess the need for additional instruction, and it did not err in rejecting the proposed defense instruction in favor of several curative admonitions it gave while the arguments were in progress. (*Ante*, fn. 6.) Further, no *Watson* prejudice has been demonstrated.

[9] For similar reasons, we reject Gonzalez's assertion that the prosecutor overstepped his bounds by using PowerPoint slides implying that defense counsel was "making up the defense," coaching witnesses and using smoke and mirrors. (See, e.g., *People v. Stitely* (2005) 35 Cal.4th 514, 559 [referring to defense counsel's argument as " 'ridiculous' " and a " 'legal smoke screen' " was not misconduct]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1002 [a prosecutor's statement that defense counsel's job was "to create straw men" and "put up smoke, red herrings" was not misconduct].) The trial court appropriately cautioned the jury on the use of these slides.

(and another uncle named Sebastian) the day after the attack supported the inference that *they*—not Acosta—were the ones perpetrating the attack. Three percipient witnesses—Acosta, Solorzano, and Antonio—testified at trial that they witnessed Gonzalez kicking Acosta in the ribs. The prosecutor's argument was based on a reasonable inference to be drawn from Jose's testimony. (See *People v. Bolton* (1979) 23 Cal.3d 208, 212 ["Closing argument presents a legitimate opportunity to 'argue all reasonable inferences from evidence in the record' "].)[10]

Nor did the prosecutor overstep his bounds when he cross-examined Gonzalez's wife Larissa by, in part, using clips of body-camera footage taken by police after they arrived at the brawl. The footage portrayed police questioning witnesses, including Acosta and his son, about the brawl and the extent of the victim's injuries. Larissa was present at the scene, may have observed the fight, and could have heard Lararosas or his brother Sebastian speak about it. Moreover, the prosecutor was entitled to probe Larissa's knowledge of Acosta's injuries in order to test her credibility.[11]

---

[10] The trial court characterized this argument as "making such a mountain out of a mole hill."

[11] In a supplemental letter brief, Gonzalez argues the prosecutor committed misconduct by inviting the jurors to place themselves in the shoes of Acosta. However, defense counsel did not object to this argument at trial, and it is forfeited. (*People v. Rundle, supra*, 43 Cal.4th at p. 157.)

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED


                                        CRANDALL, J.*


We concur:



        CHANEY, J.



        BENDIX, Acting P. J.

---

        *Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


15